UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, *ET AL.*, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION H-06-3309 |
| CITY OF HOUSTON, *ET AL.*, | § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment.  Dkts. 47 & 54.

### BACKGROUND

Service Employees International Union, ("SEIU") Local 5, is a labor union based in Houston, Texas.  Plaintiffs Tomasa Compean and Austraberta Rodriguez work as janitors and are members of the union.  In October 2006, SEIU was bargaining for a new contract that would cover approximately 5,300 janitors in Houston.  On October 17, 2006 the bargaining reached an impasse. As a result, SEIU planned a strike to be accompanied by demonstration, rallies and a parade downtown and in other business areas.  Pursuant to those plans, SEIU applied for sound amplification permits under § 30-8 of the City of Houston Sound Ordinance, and for parade permits under §§ 45-231 through 45-246 of the Parade Ordinance.  Additionally, members of SEIU were prevented from using bullhorns during demonstrations and told they needed a sound permit.  One of SEIU's sound permits and both of the parade permits were denied.

On October 19, 2006, SEIU filed its complaint against the City of Houston under 42 U.S.C. § 1983 for violations of the First Amendment. Dkt. 1. The next day SEIU filed a motion for a temporary restraining order to enjoin the City from enforcing certain aspects of the Sound Ordinance and Parade Ordinance. After a hearing on October 24, 2006, the court granted in part the motion for a temporary restraining order and enjoined the City from applying certain provisions of the ordinances against SEIU. In response to this ruling, the City amended part of its Parade Ordinance. Now before the court are the parties' cross-motions for summary judgment on stipulated facts.

## STANDARD OF REVIEW

### I.    Motion for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163-64 (5th Cir. 2006). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

2

In the instant case, the parties have filed a joint stipulation of facts.  Therefore, if the stipulated facts support a conclusion of law, then summary judgment will be proper.

## II.     First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST. amend. I.  As a threshold matter, the parties do not dispute that the city ordinances at issue here regulate protected speech in the traditional public forum—streets, parks, and sidewalks.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948 (1983) ("[S]treets and parks . . . 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'") (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954 (1939)); *New York v. Ferber*, 458 U.S. 747, 763, 102 S. Ct. 2248 (1982) (discussing categories of speech outside the protection of the First Amendment).  Therefore, the questions before the court are (1) whether the ordinances are content-neutral time, place, and manner regulations, and (2) whether—even if they are content-neutral, place, and manner regulations—the ordinances are still rendered unconstitutional because they are overbroad, vague, or impermissible prior restraints on speech.

### A.     Content-Neutral Time, Place, and Manner Regulations

The Supreme Court has long recognized the conflict between expressive activity in the public forum and the government's very real need to facilitate and protect the activities for which the public spaces are otherwise intended.  *See Heffron v. Internat'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559 (1981).  Therefore, the government may, in some instances, restrict access to the public forum through carefully crafted time, place, and manner regulations.  *Burson v.*

*Freeman*, 504 U.S. 191, 198, 112 S. Ct. 1846 (1992) (citing *Perry*, 460 U.S. at 45).  "[R]easonable time, place, or manner restrictions . . . are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."  *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065 (1984).

In reviewing the constitutionality of a restriction, the court must first determine whether it is content-based or content-neutral.  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 1746 (1989) (citing *Clark*, 468 U.S. at 295).  When assessing the neutrality of a regulation, the government's purpose in enacting the regulation is paramount.  *Id.*  If the regulation excludes expression based on content, then it is not considered a time, place and manner regulation, and is subject to "exacting scrutiny."[1] *Burson*, 504 U.S. at 198 (citing *Perry*, 460 U.S. at 45).  However, if the government justifies the regulation without reference to the content of the speech "it is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Id.*

Second, the court looks to the government's interest in promulgating the regulation, and the fit between the interest and the regulation.  While the significance of the government's interests in regulating tranquility, privacy, and repose, and public order and safety in its streets is well established, the burden of establishing that interest lies with the government.  *See Thomas v. Chicago*

---

[1]  "For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948 (1983).

*Park Dist.*, 534 U.S. 316, 122 S. Ct. 775 (2002) (park ordinance); *Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006) (parade ordinance); *Reeves v. McConn*, 631 F.2d 377 (5th Cir. 1980) (sound amplification ordinance).  The regulation must be narrowly tailored to serve the government's interest, but "it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798-99  "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897 (1985)).

Last, the court should undertake the fact-specific determination of whether there are ample alternative avenues left open for the restricted communication.  "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647.  Therefore, "alternative channels of expression . . . need not 'be perfect substitutes for those channels denied to plaintiffs.'" *Vincenty v. Bloomberg*, 476 F.3d 74, 88 (2d Cir. 2007) (quoting *Mastrovincenzo v. City of New York,* 435 F.3d 78, 101 (2d Cir. 2006)).  Those alternatives need only  "leave open sufficient alternative avenues of communication to minimize the 'effect on the quantity or content of th[e] expression.'" *Id.* (quoting *Ward*, 491 U.S. at 802).

Regulations that meet these criteria are considered reasonable time, place, and manner regulations.  However, even a regulation which initially passes muster under this inquiry may be constitutionally infirm based on the doctrines of overbreadth, vagueness, and prior restraint.

### B.      Overbreadth, Vagueness, and Prior Restraint

The doctrines of overbreadth, vagueness, and prior restraint can be "strong medicine." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 2916 (1973).  They all review the means

by which the government regulates speech, rather than the ends of the alleged injury, if any, to the party.  *See generally*, KATHLEEN M. SULLIVAN & GERALD GUNTHER, FIRST AMENDMENT LAW 346-83 (2d ed. 2003).  "An overbroad law sweeps in too much speech, a vague law is unclear about what speech it sweeps in, and a prior restraint is premature even if publication might be subsequently punished."  *Id.* at 346.  Each has the ability to narrow a law's application, or in some cases, invalidate a law in its entirety.  The doctrines may be found separately or in any combination with each other.

      1.    <u>Overbreadth.</u>

A law is considered overbroad if it reaches protected speech as part of regulating unprotected speech or conduct.  *Grayned v. City of Rockford*, 408 U.S. 104, 114-15, 92 S. Ct. 2294 (1972).  Overbreadth is an exception to the rules of constitutional litigation.  *Broadrick*, 413 U.S. at 612.

First, overbreadth allows a third party to bring suit "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Id.*  This assumption dispenses with the usual requirement of case or controversy.  *Id.*  However, the status of the challenging party dictates the available remedy.  If the party challenging the ordinance actually engaged in protected speech that the overbroad statute purports to punish, then the challenge must be as applied to the party, rather than a facial attack on the statute as a whole.  *See e.g., Virginia v. Hicks*, 539 U.S. 113, 118, 123 S. Ct. 2191, 2196 (2003) (explaining that since Hicks was arrested while engaged in conduct that was *not* constitutionally protected, he could avail himself on the overbreadth doctrine's special standing rules and bring a facial challenge); *de la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 505-06 (5th Cir. 2005) (finding that de la O already had actual standing since she was injured by the law in question

while engaged in First Amendment-protected activity, and therefore could not bring a facial challenge). So paradoxically, people who engage in protected speech and have actual injury have limited standing—actual injury—and may not bring a facial challenge. *Los Angeles Police Dept. v. United Reporting Pub. Corp.*, 528 U.S. 32, 37-41, 120 S. Ct. 483 (1999). Whereas, people who either (1) are engaged in unprotected speech and have actual injury, or (2) are not yet injured have broader standing to bring a facial challenge. *Broadrick*, 413 U.S. at 612. There is an exception to this standing paradox. If the statute is so fatally flawed that it cannot be constitutional as to anyone, then a party with actual injury can invalidate the statute through a facial challenge. *See, e.g., Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 107 S. Ct. 2568 (1987) (striking down a resolution prohibiting all First Amendment activity in the Central Terminal Area as "spectacularly overbroad").

The second exception to the usual rules of constitutional litigation is the remedy for overbreadth. If the court finds that a regulation is overbroad on its face, then "any enforcement of [that regulation] is totally forbidden." *Broadrick*, 413 U.S. at 613. Understandably, the Supreme Court has limited the application of the overbreadth doctrine to those cases where there is "substantial" overbreadth. *Hicks*, 539 U.S. at 119-20.

> As we noted in *Broadrick*, however, there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot prohibit all enforcement of that law—particularly a law that reflects "legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." To ensure that these costs do not swallow the social benefits of declaring a law "overbroad," we have insisted that a law's application to protected speech be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the "strong medicine" of overbreadth invalidation.

*Hicks*, 539 U.S. at 119-20 (internal citations omitted). However, the court may uphold even a facially overbroad ordinance if a limiting construction could be readily placed on the challenged

provision.  *Broadrick*, 413 U.S. at 613; *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980).  In part, the court must decide whether the improper part of the statute or ordinance is easily severable from the rest.  *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 105 S. Ct. 2794, 2801 (1985).  Additionally, "overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner."  *Broadrick*, 413 U.S. at 614.  Therefore, an easily severable section of a law regulating conduct which incidentally burdens protected activity will almost never render a law wholly invalid.

2.   <u>Vagueness</u>

Parties frequently bring challenges on both overbreadth and vagueness.  Although often uttered in virtually the same breath, the two doctrines are distinct from one another.  Vagueness addresses concerns of fair notice and selective enforcement.  *Grayned*, 408 U.S. at 110.  The fair notice requirement comes into play when persons "of common intelligence must necessarily guess at [a law's] meaning and differ as to its application."  *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127 (1926).  Additionally, the vagueness doctrine helps to prevent selective enforcement by requiring that "laws must provide explicit standards for those who apply them."  *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2299 (1972).  Paradigmatic examples of laws running afoul of the vagueness doctrine are loitering laws which allow ad hoc interpretations by those enforcing them.  *See, e.g., Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855 (1983) (invalidating a law that required people loitering to provide a "credible reason" for their presence when asked by a policeman); *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686 (1971) (finding a law that required when "three or more people meet together on a sidewalk

or street corner, they must conduct themselves so as not to annoy any police officer or other person who should happen to pass by" to be both vague and overbroad).

Vague laws that encroach upon areas protected by the First Amendment may cause citizens to steer wider of the forbidden zone than if the boundaries were clearly marked. *Grayned*, 408 U.S. at 109. Because citizens may forbear to exercise their protected rights for fear of censure, facial First Amendment challenges based on vagueness—like those based on overbreadth—are exceptions to the rules of standing. *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 59-60, 96 S. Ct. 2440 (1976). However, the Fifth Circuit has held that a law "cannot be held void for vagueness unless it is 'impermissibly vague in *all* of its applications.'" *Hill v. City of Houston*, 789 F.2d 1103, 1127 (5th Cir. 1986) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 497, 102 S. Ct. 1186, 1193 (1982)) (emphasis in original).

### 3.   Prior Restraint.

The doctrine of prior restraint strikes to the very core of activity the First Amendment was drafted to combat. *Thomas*, 534 U.S. at 320. The Printing Act of 1662 required that a government official approve a license for printing of any book, pamphlet or newspaper to suppress works that were "seditious, schismatical, or offensive." *Id.* (internal citation omitted). The memory of the Printing Act stayed with the colonists and prompted, in part, the drafting of the First Amendment. *Id.* Prior restraint is an order by an official or a court that regulates or forbids expressive activity before it occurs. *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993). An "ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies in 'the archetype of a traditional public forum,' is a prior restraint on speech." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395, 2401 (1992). Prior restraints come

9

before the court under a heavy presumption against their validity.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639 (1963).  And, unlike overbreadth and vagueness, the prior restraint doctrine allows any party—regardless of actual injury—to challenge the law on its face.  *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759, 108 S. Ct. 2138, 2145 (1988) ("[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.").  Since every challenge based on prior restraint is a facial challenge, the remedy is always complete invalidation. *Id.* at 770.

The courts have long understood the balance between the uses of the public forum and have allowed municipalities to impose permit requirements for parades, demonstrations, and rallies as appropriate time, place, and manner regulations.  *Forsyth*, 505 U.S. at 130.  However, these licensing schemes must meet certain constitutional safeguards.  *Id.*  First, the permitting process "may not delegate overly broad licensing discretion to a government official." *Id.*  Next, a proper time, place, and manner regulation may not be based on the content of the message. *Id.*  The regulation "must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Id.*  "If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgement of our precious First Amendment freedoms is too great." *Id.* at 131.  Although, the court should look to the officials' constructions and interpretations of the ordinance, the success of a facial attack on unbridled official discretion is based on whether there is anything in the ordinance to prevent him or her from exercising his discretion in a content-based manner. *Id.* at 133 n. 10.

**ANALYSIS**

SEIU brings both facial and as-applied challenges to the City of Houston's Sound and Parade Ordinances.   Additionally, SEIU argues that the City of Houston's Parks Ordinance is facially unconstitutional.

## I.      The Sound Ordinance

SEIU contends that the Sound Ordinance is an unconstitutional abridgment of its First Amendment right to free speech because (1) the exceptions to the Sound Ordinance as listed in § 30-9 are content-based and do not serve a compelling government interest; (2) the sound permitting regulations contained in §§ 30-6, 30-7 & 30-8 are unconstitutionally vague; and (3) the sound regulation found in § 30-8(a)(4) restricting the issuance of sound equipment permits to twice per month for any one location is not a reasonable time, place, and manner regulation because it serves no significant government interest.   Dkt. 48.

### A.      § 30-9 Defenses to Violations of the Noise and Sound Level Regulations

SEIU argues that the exemptions contained in § 30-9 are content-based and must therefore serve a compelling government interest to be constitutional.   Specifically, SEIU argues that subsections (e), (j) & (k) are indistinguishable from non-exempt sound except for the content of the sounds exempted.   These subsections grant partial exemptions for sound made by (1) construction of buildings or structures, (2) church bells or chimes, and (3) activities on public playgrounds, parks and school grounds. They provide a defense to a violation of the Sound Ordinance, if:

> (e)      The sound was produced by the erection, excavation, construction, or demolition of any building or structure, including the use of any necessary tools or equipment, conducted between the hours of 7:00 a.m. and 8:00 p.m.,

which activity did not produce a sound exceeding 85 dB(a)[2] when measured from the property line of the residential property where the sound is being received.

•     •     •

(j)     The sound was produced by church bells or church chimes when used as part of a religious observance or service during daytime hours, provided the sound did not cumulatively exceed five minutes duration in any one hour period.

(k)     The sound was produced during daytime hours by activities conducted on public parks, public playgrounds, and public or private school grounds, including, but not limited to, school athletic and school entertainment events.

§§ 30-9(e), (j) & (k).

SEIU argues that by exempting certain sounds from the ordinance, the City has essentially created categories of more and less favored speech.  The City responds that none of the exemptions is based on the content of the sound but rather on the volume of the sound.  The Supreme Court "frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215, 95 S. Ct. 2268 (1975) (citing  *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488-489, 75 S. Ct. 461 (1955)).  "This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression."  *Id.*  In *City of Ladue v. Gilleo*, the Supreme Court explained that  "the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles."  *City of Ladue v. Gilleo*, 512 U.S. 43, 51, 114 S. Ct. 2038 (1994).  However, "a limitation on speech that is not all-encompassing may still be narrowly tailored where the underinclusivity does not favor a particular viewpoint or undermine the rationale given for the regulation." *Bowman v. White*, 444 F.3d 967, 983 (8th Cir. 2006) (citing *Nat'l Fed. of the Blind v. FTC*, 420 F.3d 331, 345-46 (4th Cir. 2005); *Children of the Rosary v. City of*

---

[2]  "dB(A) shall mean the intensity of a sound expressed in decibels."  § 30-1.

*Phoenix*, 154 F.3d 972, 982 (9th Cir. 1998); *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 957-58 (D.C. Cir. 1995)).

The City argues that the exemptions make no reference to the message underlying the sounds exempted, but rather the volume of the sounds emanating from the events. Dkt. 53. SEIU counters that the exemptions are not based on volume, but rather content. Dkt. 48. The court disagrees. In the plain language of the Sound Ordinance, none of the exemptions makes reference to the content of the expression. Nor, are the City's stated purposes related to a disagreement with—or encouragement of—any message. Dkt. 49 ¶2 ("The City's reason for regulating sound in the Sound Ordinance is to protect citizens from excessive sound volumes that may jeopardize their health, safety, or welfare, or degrade their quality of life."); *see also* §30-2 (regulating "loud, unnecessary or unusual noise that annoys, disturbs, injures, or endangers the comfort, repose, health, peace, or safety of others"). Therefore, under *Ward* the exemptions are deemed neutral. *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

Additionally, the exemptions clearly contemplate that the sounds will be different in duration and volume from those regulated by the ordinance. Construction noise, while fairly constant, is by its nature of finite duration. Buildings cannot be constructed in two 14-hour periods every 30 days. So, groups constructing buildings could not operate within the limitation of the Sound Ordinance even were they required to.[3] And, the construction exemption still puts time limits and noise limits on the construction in an attempt to ameliorate the intrusion of the noise into the surrounding areas. The parks and schools exemption is a recognition that the sounds emanating from parks and

---

[3] The court also notes that although construction may be exempt from sound permits, it is likely that every construction project is subject to a great many other permitting obligations.

playgrounds are generally intermittent and unlikely to create the type of disturbance that the Sound Ordinance as a whole seeks to protect—"loud, unnecessary or unusual noise that annoys, disturbs, injures, or endangers the comfort, repose, health, peace, or safety of others." § 30-2.  The exemption for schools, both public and private, is similarly based on the quantity and volume of sound produced by school activities.  Moreover, the City limits the parks and schools exemption to daytime hours to protect the tranquility of residents who may live near the parks and schools.  The court finds that neither subsection (e) nor subsection (k) is content-based.

Subsection (j) exempts church bells and chimes used as part of a religious observance or service during the day.  Although the exemption on its face applies only to religious bells and chimes, the plain language of the exemption supports the argument that it is content-neutral, based on the duration, character, and volume of the sound.  The exemption limits the sound to five minutes out of every hour during daytime hours.  This limitation demonstrates the understanding that church bells and chimes are of limited duration and therefore  are "non-intrusive . . . acceptable background noise."  *Stokes v. City of Madison*, 930 F.2d 1163, 1170 (7th Cir. 1991).  The Seventh Circuit examined a similar ordinance in *Stokes*, exempting "churches broadcasting or reproducing music by sound reproducing devices on Sundays or religious holidays."  *Id.* at 1166.  The *Stokes* court found the exemption to be content-neutral holding that

> [w]here the perceived harm from speech is its intrusiveness (to some extent proxied by volume) and not its content, the relevant inquiry is not who broadcasts but what the decibel level and the sheer consciousness-piercing quality of the sound may be. The Council's decision is, in effect, a determination of intrusiveness based on the character of sound. Church bells on Sunday morning, for example, are a traditional and generally unobtrusive aspect of a tranquil environment.

*Id.* at 1171.  Here, the noises that the statute purports to address are described as "loud, unnecessary or unusual noise that annoys, disturbs, injures, or endangers the comfort, repose, health, peace, or

safety of others." §30-2(a).  Like the exception to the ordinance in *Stokes*, the church bells or chimes exemption here is based solely on the intrusiveness of the sound and is likewise content-neutral. Therefore, the exemptions to the Sound Ordinance do not render it content-based and subject to strict scrutiny.[4]

**B.    § 30-8(a)(4) Limit on Number of Permits for Amplified Sound**

SEIU argues that § 30-8(a)(4) of the Sound Ordinance is unconstitutional because it is not narrowly tailored to serve a significant government interest and does not leave open ample avenues of expression.  Dkt. 48. Section 30-8(a)(4) reads as follows:

> [The permit] shall not be issued to the same or any other person for the same location more than twice during any 30 day period.  In the case of a sound truck, location shall relate to the area traversed by the truck in one day.

§ 30-8(a)(4).  It is beyond dispute that the government's interest in regulating noise to promote tranquility and repose is significant.  *Ward*, 491 U.S. at 796; *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S. Ct. 2118 (1984); *Kovacs v. Cooper*, 336 U.S. 77, 82, 69 S. Ct. 448 (1949).

---

[4]  However, the court notes that even if the ordinance were content based, it would be a narrowly drawn regulation necessary to serve a compelling government interest.  *Perry*, 460 U.S. at 45.  The exemption allowing church bells and chimes used as part of a religious service or observance is a legitimate accommodation to religious belief under the Free Exercise clause of the First Amendment.  *See Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595 (1990).  Additionally, although the ordinance is an exception rather than an affirmative statute or ordinance, the court finds that it would not be an impermissible establishment of religion under the Establishment clause of the First Amendment.  *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2501 (1971).  As the Seventh Circuit noted in *Stokes*, church bells are a common part of the background noise of a city.  *Stokes v. City of Madison*, 930 F.2d 1163, 1170 (7th Cir. 1991).  The church bells have "become part of the fabric of our society [and] not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  *Marsh v. Chambers*, 463 U.S. 783, 792, 103 S. Ct. 3330 (1983) (upholding the Nebraska Legislature's "practice of opening legislative sessions with prayer").

SEIU urges that the ordinance is not narrowly tailored because it does not differentiate levels of sound based on the different areas within the city. However, upon a closer reading of the ordinance, this argument must fail. The first part of § 30-8 expressly states that permits are required when a person wishes to exceed the levels of sound specified in § 30-6. And, § 30-6 distinguishes between residential and non-residential areas and between daytime and nighttime hours. Therefore, even if the court were to accept that a blanket sound permitting ordinance would be *ipso facto* invalid, the facts in this case show that § 30-8(a)(4) is not a blanket ordinance.

SEIU also argues that § 30-8(a)(4) is not narrowly tailored because it does not follow the *Grayned* Court's instruction to ask "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 116. SEIU points to the Fifth Circuit's ruling in *Reeves v. McConn* that invalidated an earlier iteration of the City of Houston's Sound Ordinances to suggest that the current version is likewise invalid. *Reeves*, 631 F.2d at 385. However, the ordinance in *Reeves* is distinguishable from § 30-8(a)(4). In *Reeves*, the court described the Sound Ordinance as "[a]n absolute and city-wide prohibition of all sound amplification except during nine hours of the day." *Id.* Under the ordinance in *Reeves*, amplified sound was only permitted in the downtown business district between 1:00 p.m. and 7:00 p.m. on Sundays. *Id.* at 383. Moreover, during the rest of the hours of the day or night, the ordinance restricted the use of *any* sound amplification whatsoever "no matter how low its volume or orderly its presentation." *Id.* The incredibly restrictive ordinance invalidated in *Reeves* is a far cry from the City's current Sound Ordinance.

Under the current ordinance, amplified sound at levels lower than those detailed in § 30-6 are allowed in the traditional public fora at any time provided it does not disturb the surrounding residents. § 30-4. Amplified sound permits may be obtained for all downtown locations twice per

month.  And, the decibel level allowed in downtown is always higher than the level allowed in residential sections.  §30-6.  The court finds that the City has properly allowed "[t]he nature of a place, 'the pattern of its normal activities,  [to] dictate the kinds of regulations of time, place, and manner that are reasonable'" when drafting the Sound Ordinance.  *Grayned*, 408 U.S. at 116. Additionally, if the ordinance were to allow amplified sound permits every day in the same locations, the Sound Ordinance itself would become meaningless.  And, protecting its citizenry from noise is a significant government interest sufficient to allow at least some reasonable regulation.  *Kovacs*, 336 U.S. at 82.  Therefore, the court finds that § 30-8(a)(4) is sufficiently narrowly tailored for a content-neutral time, place, and manner restriction because it advances a significant government interest in noise reduction "that would be achieved less efficiently without the regulation."  *Ward*, 491 U.S. at 799.

However, SEIU further argues that even if § 30-8(a)(4) is narrowly tailored, it does not leave open ample alternative avenues of expression.  Citing *Reeves*, SEIU argues that limiting the sound amplification permits to two per location per 30 days denies the speaker *effective* speech.  *Reeves*, 631 F.2d at 382.  Although the proposition that "[t]he right to communicate inherently comprehends the right to communicate effectively," the right to effective speech does not always allow the speaker to dictate the time and manner of his speech.  *Id.*  "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647 (citing *Adderly v. Florida*, 385 U.S. 39, 47-48, 87 S. Ct. 242 (1966); *Poulos v. New Hampshire*, 345 U.S. 395, 405, 73 S. Ct. 760 (1953)).  In *Heffron*, the Supreme Court upheld a Minnesota law that mandated that all persons wishing to sell, exhibit or distribute materials on the grounds of the state fair do so only from a fixed location.  *Id.* at 643.  The respondents, the International Society for Krishna Consciousness ("ISKCON"), practiced a religion that as one of its

religious tenets required its adherents to go to public places to solicit donations or sell literature about their religion. *Id.* at 645. The government argued that the combination of large crowds of fair-goers mixed with ISKCON adherents attempting to stop them created potentially dangerous bottlenecks. *Id.* The Court agreed and found that the regulation requiring a fixed location inside the fairgrounds did not detract from ISKCON's ability to "reach the minds of willing listeners." *Id.* at 655 (quoting *Kovacs*, 336 U.S. at 87). Here, the regulation does not diminish SEIU's ability to win the attention of its chosen audience—building management throughout the city. Unlike the ordinance in *Reeves* the Sound Ordinance here allows SEIU to use amplified speech at levels less than 68 decibels at any time, and amplified sound of up to 75 decibels twice in 30 days in specific locations.[5] Therefore, like the Court in *Heffron*, this court finds that SEIU has ample alternative channels for expression.

### C.  §§ 30-6, 30-7, and 30-8 Permitting for Amplified Sound

SEIU brings overbreadth and vagueness challenges to §§ 30-6, 30-7, and 30-8 both facially and as-applied.[6] As a predicate matter, SEIU lacks standing to bring a facial challenge based on overbreadth and vagueness, because it has actual injury. *See* Sections II.B.1-2 *supra*. "When members of [SEIU] attempted to use bullhorns and/or megaphones in demonstrations, they were stopped by City of Houston police and informed that in order to use the devices, [they] would need to procure sound amplification permits from the City." Finding of Fact, Dkt. 17 ¶13. "When [SEIU] applied for the sound amplification permits, one of its applications was denied" pursuant to § 30-

---

[5] In theory, a speaker could get permits for 15 adjacent locations in downtown Houston and thereby engage in amplified speech in downtown every day for 30 days.

[6] SEIU also brings an as-applied overbreadth challenge to § 30-8(a)(4). However, the court will discuss it as part of its examination of §§ 30-6, 30-7, and 30-8.

8(a)(4). *Id.* ¶16; Dkt. 49 ¶3. Moreover, SEIU has not, nor can it show that the Sound Ordinance is unconstitutional as to everyone. Any "arguably impermissible applications" of the Sound Ordinance are far outweighed by the many permissible applications in furtherance of the City's legitimate interest in protecting its citizenry from excessive noise. *See New York v. Ferber*, 458 U.S. 747, 773, 102 S. Ct. 3348 (1982). Therefore, SEIU may only bring challenges to the Sound Ordinance on an as-applied basis.

SEIU argues that the Sound Ordinance is overbroad and vague because SEIU demonstrators were unable to ascertain the decibel levels output by their bullhorns. The bullhorns used by SEIU did not have any gauge that would inform the user of the decibel level of the output of the bullhorn. Findings of Fact, Dkt. 17 ¶14. Additionally, the police did not measure the decibel levels emanating from SEIU's bullhorns before they ordered SEIU to cease using them. *Id.* Moreover, police officers are not normally equipped with equipment capable of measuring the decibel level of sound. *Id.* ¶ 15. The City argues that (1) the ordinance does contain an easily ascertainable standard; and (2) because the ordinance provides a detailed explanation of the methodology used to measure sound, it cannot be vague.

The City first points to § 30-4 which provides:

It shall be unlawful for any person to make, assist in making, permit, continue, cause to be made or continued, or permit the continuance of any sound using any sound amplifier that is part of or connected to any speaker system, radio, stereo receiver, compact disc player, cassette tape player, microphone, or any other sound source, when operated: (I) in such a manner as to disturb the peace, quiet, and comfort of the neighboring inhabitants, or (ii) at any time with louder volume than is necessary for convenient hearing for persons who are in the vehicle or within the property or premises in which such sound amplifier is operated and who are voluntary listeners thereto. The operation of any such sound amplifier in such a manner as to be plainly audible at a distance of 50 feet from a vehicle shall be presumed to be violative of this section. The operation of any such sound amplifier in such a manner that bass

sounds are plainly audible at a distance of 50 feet from the property line of a property or premises in which the amplification is located shall be presumed to be violative of this section.

§ 30-4(a). Additionally, § 30-4(b) provides that proof of possession of a permit under § 30-8 is affirmative defense to a violation of § 30-4. The Eleventh Circuit recently decided a facial challenge to a similar ordinance for overbreadth and vagueness. *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1269-72 (11th Cir. 2007). While the court found that the plaintiff did not have standing to bring a facial overbreadth challenge, it found that the ordinance was not unconstitutionally vague, because the language "louder volume than was necessary for convenient hearing" gave sufficient notice both to the speaker and to law enforcement. *Id.* at 1271-72.

However, this court cannot reach the question of whether the Sound Ordinance was overbroad or unconstitutional as applied to SEIU. The summary judgment record does not contain sufficient facts to indicate whether the police stopped SEIU from using the bullhorn based on a determination that the sound from the bullhorn was louder than necessary or on a determination that the sound from the bullhorns exceeded 68 decibels. The summary judgment record contains evidence that the police officer did not measure the decibel level before requesting that SEIU stop using the bullhorn. Finding of Fact, Dkt. 17 ¶ 13, 14. And, the bullhorn used by SEIU has no capability to measure its own output. *Id.* ¶ 14. However, since the court cannot determine which section was applied to SEIU, it cannot make an as-applied determination as to §§ 30-6, 30-7 and 30-8. Therefore, summary judgment on this issue is inappropriate.

## II.    The Parks Ordinance

SEIU brings a facial challenge to the City of Houston Parks Ordinance on several bases: (1) that §§32-61 and 32-62 requiring a permit to hold a public meeting or gathering is vague, overbroad, and an impermissible prior restraint, (2) that § 32-66 requiring organizers to provide security

20

precautions is an impermissible prior restraint on protected expression, (3) that § 32-32 prohibiting signs and posters in the parks is not a proper time, place, and manner restriction, and (4) that § 32-26 restricting musical instruments in the park other than for the enjoyment of the musician is a content-based restriction for which the City lacks a compelling interest sufficient to regulate.

### A. §§ 32-61 and 32-62 Permits for Public Gatherings

SEIU argues that the permitting scheme for the City of Houston parks is unconstitutional because it is vague and overbroad. As discussed above, overbreadth occurs when a law restricts substantially more protected expression than necessary to achieve its legitimate regulatory goal. A vague law does not provide adequate notice to the speaker or law enforcement of what speech is prohibited. *See* Sections II.B.1-2 *supra*.

The government has a legitimate interest in requiring a permit for the use of its parks. Section 32-64 lists reasons for which a permit may be denied and sheds some light on the goals of the permits. Extrapolating from § 32-64, the goals of the permits are: (1) to prevent two groups attempting to use the space at the same time, (2) to ensure that the parks collect fees for use, (3) to monitor items being offered for sale in the parks, (4) to protect the improved areas of the park from extraordinary wear and tear from groups that are too large for the facilities, (5) to facilitate the safe and orderly movement of traffic, including emergency vehicles through and around the park, and (6) to ensure that all parts of the parks are available for their designated use without impairment. *See* § 32-64. All of these interests are recognized as significant government interests under the rubrics of health and safety, and tranquility and repose. *Ward*, 491 U.S. at 796; *Vincent*, 466 U.S. at 806; *Kovacs*, 336 U.S. at 82. The City may require a permit to achieve these legitimate goals. *Ward*, 491 U.S. at 797 ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer."); *Forsyth*, 505 U.S. at 130 ("[T]he Court has

recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally.").

SEIU argues that the ordinance is unconstitutionally vague because it does not define a "public meeting or gathering" or "designated areas of the park."  Additionally, it alleges that the vagueness of the ordinance renders it overbroad, sweeping in more protected speech than is necessary.  When using phrases like "meeting" or "gathering" both vagueness and overbreadth can come into play.  *See American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 609 (6th Cir. 2005) (discussing the term "group").  The implication under a vagueness inquiry in this case is whether persons wishing to use the park can discern (1) what number of people triggers the requirement of a permit, and (2) which areas require permits.

Although the phrases "meeting" and "group" are not defined by the ordinance, the court finds that they are not unconstitutionally vague.  "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 100.  Instead the Supreme Court has upheld laws "marked by 'flexibility and reasonable breadth, rather than meticulous specificity.'" *Id.* (citing *Esteban v. Cent. Missouri State Coll.*, 415 F.2d 1077, 1088 (8th Cir. 1969) (Blackmun, J.)).  In the instant case, flexibility is necessary to the operation of the parks and the permitting scheme itself.  The Houston Parks & Recreation Department oversees 350 developed parks and more than 200 green spaces.  Houston Parks & Recreation Department, Department Overview, available at http://www.houstontx.gov/parks/aboutus.html (last visited Mar. 27, 2008).  The parks include facilities that take a wide variety of forms, including a velodrome, outdoor theater, open air basketball courts, golf courses, community pools, playgrounds, nature trails, baseball, softball, football, soccer and rugby fields, neighborhood swimming pools, and picnic areas.  Houston Parks & Recreation Department, 2001 Parks Mater Plan: Existing Parks and Facilities, available at

http://www.houstontx.gov/parks/masterplan/existing.pdf (last visited Mar. 27, 2008).  Clearly, the ordinance cannot be a "one size fits all" proposition.

Additionally, the undefined nature of the terms "meeting" and "gathering" does not render the ordinance unconstitutionally overbroad.  Assuming for the sake of argument that the ordinance did sweep in more protected speech than necessary to carry out its legitimate goal of regulating parks, it still would not render the ordinance invalid because it is not substantially overbroad.  *Hicks*, 539 U.S. at 119-20. ("[A] law's application to protected speech [must] be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the "strong medicine" of overbreadth invalidation.").  Therefore, the ordinance's lack of a definition for the terms "meeting" or "gathering" do not invalidate the ordinance as a whole based on overbreadth or vagueness.

SEIU also argues that the ordinance is constitutionally infirm because the ordinance does not define "designated areas of the park."  The court disagrees.  The ordinance itself is precise and outlines for the average person where to go to get the information needed to determine whether a permit is required.  The ordinance on its face defines the designated areas of the park.

> (a)     No permit shall be required to use the parks or to hold any public meeting or gathering except in the following designated areas of the parks:
> > (1)     Any building or facility for which a rental fee is imposed by the city pursuant to section 32-69 of this Code;
> > (2)     Any baseball field, basketball court, tennis court, swimming pool, golf course, or other area specifically designated and equipped for sporting or recreational events, whether a rental fee is imposed pursuant to section 32-69 of this Code therefor or not;
> > (3)     The Houston Zoo;
> > (4)     The Houston Arboretum;
> > (5)     Any other improved and specially maintained area so designated by a rule or regulation promulgated pursuant to section 32-5 of this Code.

(b)     The director shall maintain in each of the parks a map of the areas designated in or pursuant to subsection (a) of this section as applicable to that park. A complete list of the parks with designated areas shown thereon shall be maintained in the offices of the director and the city secretary.

(c)     Use of the areas designated in or pursuant to subsection (a) of this section shall be on a first-come first-served basis. The director shall cause all completed written applications received pursuant to section 32-63 of this Code to be immediately time stamped upon their actual receipt by his office. The first in time shall be the first in right, provided that if two or more conflicting applications are received simultaneously, then the precedence shall be determined by an impartial means of chance.

§ 32-61. SEIU argues that § 32-61(a)(5) requiring a permit for "[a]ny other improved and specially maintained area so designated by a rule or regulation promulgated pursuant to section 32-5 of this Code" is vague and overbroad. However, the determination of what areas of the parks are improved and maintained areas under § 32-61(a)(5) is not beyond the common ken. And, § 32-61(b) directs the Parks Department to keep a list of the designated areas.[7] There is simply no vagueness present here. Nor can the court find any evidence of overbreadth. Therefore, mindful of the reticence with which courts should act to wholly invalidate regulations, and in the absence of substantial overbreadth or an ordinance that is vague in all its applications, the court finds that the permitting scheme of the Parks Ordinance is not unconstitutionally vague or overbroad.

Last, SEIU argues that because these terms are undefined, the ordinance is an impermissible prior restraint on speech, because it grants overly broad authority to the decisionmaker to deny permits. The court disagrees. On the contrary, the Parks Department has three choices only: (1) grant the permit, (2) deny the permit under § 32-64, or (3) inform the applicant that no permit is needed under § 32-61. And, the Parks Department has absolutely no discretion regarding when it

---

[7] SEIU argues and the City concedes that the Parks Department is in violation of § 32-61(b) because it does not maintain a list or map of designated areas. Dkt. 49 ¶ 12. However, the Park's Department's failure does not implicate the constitutionality of the ordinance on its face.

may deny permits.  Section 32-64 mandates that a permit must be granted unless it meets one of five specific criteria that are in no way related to the content of the speech—if there is any speech involved.  While two of the five criteria call for assessments of the activity and the facility for which the permit is sought, the assessments are carefully guided by significant government interests that the Parks Department is allowed to take into account—safety, noise, and preserving the park for use by all of the public.  *See Ward*,  491 U.S. 797; *Clark*, 468 U.S. at 297.  Furthermore, under § 32-67 a party whose permit is denied has an automatic appeal to city council which must render a decision on the appeal within 7 days or the permit is deemed granted.  And finally, the ordinance leaves open ample alternative avenues of expression.  No permit is needed for those areas not specified in § 32-61. Therefore, the City of Houston's Parks Ordinance permitting scheme is not an impermissible prior restraint on speech, because it is a reasonable content-neutral time, place, and manner regulation that does not delegate overly broad discretion to the Parks Department.  *See Forsyth*, 505 U.S. at 130.   Accordingly, the Parks Ordinance is not invalidated under a facial attack on the constitutionality of its permitting scheme under the doctrines of overbreadth, vagueness, and prior restraint.

**B.**     **§ 32-66 Security Precautions**

The Parks Ordinance contains a provision allowing the director, in certain cases, to require that the applicant submit a security proposal before a permit will be granted.  SEIU submits that this section grants the director the ability to unconstitutionally burden speech through the use of fees for unwanted content.  The section reads:

> If the director determines that the conduct of the meeting may reasonably cause severe injury to persons or property, or create a riot or disturbance detrimental to the health, safety and welfare of the public, he may require additional security precautions be taken to permit the use of the designated area.  In such event, the director may grant the permission upon condition that the applicant must submit a

written proposal for security and obtain the director's approval thereof prior to the public gathering.  Such proposal shall be subject to review, approval and appeal in the same manner as a permit application under this article provided that the director shall have two (2) days in lieu of three (3) days in which to approve or deny the proposal.

§ 32-66.  As discussed above, the government's interest in the Parks Ordinance is significant. "The guidelines used by a licensor in granting or refusing a permit, however, must be related to the legitimate government interest in protecting health, safety, and welfare, and must be precisely and narrowly drawn to prevent discretionary decision-making." *Beckerman v. City of Tupelo*, 664 F.2d 502, 509 (5th Cir. 1981) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153, 89 S. Ct. 935 (1969)).

In *Forsyth*, the Supreme Court invalidated a permitting scheme that allowed the county to assess a fee based on the county's estimate of the cost of protection needed by both the speaker and the observers. *Forsyth*, 505 U.S. at 134.   The Court found that in order to determine whether demonstrations would need more or less security, the county would be required to evaluate the content of the expression.  *Id.*  "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."  *Id.* at 134-35. "Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit."  *Id.* at 135.

In *Beckerman*, the Fifth Circuit invalidated a parade ordinance that allowed the chief of police to deny a parade permit if "the conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance."  *Beckerman*,  664 F.2d at 507.

This provision falls as an impermissible prior restraint upon free speech because it is not narrowly drawn to relate to health, safety, and welfare interests, but instead it sanctions the denial of a permit on the basis of the so-called "hecklers' veto." In authorizing the denial of a permit because the licensor has determined the activity will provoke disorderly conduct in others, the state treads on thin ice. There is a host

> of Supreme Court cases dealing with the issue of the "hecklers' veto." In almost every
> instance it is not acceptable for the state to prevent a speaker from exercising his
> constitutional rights because of the reaction to him by others.

*Id.* at 509 (citing *Coates*, 402 U.S. at 615-16; *Bachellar v. Maryland*, 397 U.S. 564, 567, 90 S. Ct.

1312 (1970); *Gregory v. Chicago*, 394 U.S. 111, 117, 89 S. Ct. 946 (1969); *Street v. New York*, 394

U.S. 576, 592, 89 S. Ct. 1354 (1969); *Edwards v. South Carolina*, 372 U.S. 229, 237-38, 83 S. Ct.

680 (1963); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S. Ct. 894 (1949); *Stromberg v. California*,

283 U.S. 359, 51 S. Ct. 532 (1931)).

The City argues that in *Thomas* the Supreme Court upheld a parks ordinance that allowed a

permit to be denied for, among other things, "when the intended use would present an unreasonable

danger to the health or safety of park users or Park District employees." *Thomas*, 534 U.S. at 324.

And, perhaps if § 32-66 looked only at the intended use of the designated area and the possibility that

the intended use might impact the health and safety of the people in the park, § 32-66 would not be

impermissible. *But see Shuttlesworth*, 394 U.S. at 938 (invalidating a similar ordinance because "the

members of the Commission were to be guided only by their own ideas of 'public welfare, peace,

safety, health, decency, good order, morals or convenience"). However, the ordinance goes further.

The court finds that this section is unconstitutional for two reasons. First, § 32-66 provides

that the director may require security if he deems that "the conduct of the meeting may reasonably

cause . . . a riot or disturbance." Clearly § 32-66, by its plain language regulates conduct not speech.

But, the First Amendment has been interpreted to cover not just verbal expression, but also

expressive conduct. *See Texas v. Johnson*, 491 U.S. 397 (1989). Expression may be—and often

is—intended to provoke emotion in its listeners. *Terminiello*, 337 U.S. at 11 ("Freedom of speech

undoubtedly means freedom to express views that challenge deep-seated, sacred beliefs and to utter

sentiments that may provoke resentment."). "Listeners' reaction to speech is not a content-neutral

basis for regulation." *Forsyth*, 505 U.S. 134.  The director's ability under § 32-66 to deny an applicant's permit or to require that an applicant submit a plan and pay for security if the director foresees the possibility of a riot or disturbance simply must be based on content.  And, constitutional permitting schemes must be content neutral.

Second, there are absolutely no guidelines to determine how much applicants must pay to obtain security.  The applicants must submit the "bid" for security themselves, but there are no minimums or maximums to the fees— it is an endless sliding scale.  Moreover, there are no guidelines to inform the director's decision regarding whether the security plan is sufficient.  And, although § 32-66 allows for review of denial of a permit like any other type of permit denial in the Parks Ordinance, that does not cure the ad hoc nature of the security requirement.  Therefore, the court finds that the security requirement contained in § 32-66 of the Parks Ordinance is an impermissible prior restraint on speech and therefore void.[8]

### C.    § 32-32 Prohibition on Erecting Structures, Bill Posting, etc.

SEIU urges the court to invalidate Parks Ordinance section 32-32 because it is not narrowly tailored.  Section 32-32 reads as follows:

> It shall be unlawful for any person to place, erect, attach any structure, sign, bulletin board, post, pole or advertising device of any kind whatever in the parks, or to attach any notice, bill, poster, sign, wire, rod or cord to any tree, shrub, fence, railing, post or structure in the parks unless authorized by rule or regulation promulgated pursuant to section 32-5 of this Code.

§ 32-32.  The City argues that people using the parks do not have a constitutional right to damage the City's parks.  Dkt. 53.  Article II of the Parks Ordinance is comprised of sections addressing

---

[8]  The court finds that simply removing the phrase "create a riot or disturbance" will not cure the unconstitutionality of the section because it still would not offer any content-neutral standards on which the director could base his decision.  *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 117 S. Ct. 2329 (1997).

damage to the parks and the people who use the parks. In addition to the two sections addressed in this opinion, Article II forbids glass containers, camping, driving vehicles, riding or driving animals, molesting or injuring animals or fish, walking or standing in the flower beds, hunting, firearms, fishing, and canoeing. §§ 32-27 through 32-37.

SEIU does not contest that § 32-32 is content neutral. Moreover, it recognizes the City's significant interests in preserving the parks from physical damages and to advancing esthetic values. Instead it argues that the City may not create a total media ban forbidding all signs anywhere in the parks at any time. SEIU contends that the ordinance should provide allowances for signs that do no damage to the parks and are temporary. These arguments are unavailing. The Supreme Court in *Vincent* upheld that a Los Angeles city ordinance that forbade placing signs and handbills on public property. *Vincent*, 466 U.S. at 810. The Court found that the ordinance was narrowly tailored because it addressed exactly those areas that were the subject of the City's interest—visual blight—and no more. *Id.* Additionally, the Court pointed out that the regulated conduct of sign-posting was "not merely a possible by-product of the activity, but [was] created by the medium of expression itself." *Id.* Likewise here, the two interests the City seeks to address are damage to the parks and visual blight. Both of these evils are actually created by those actions addressed by § 32-32. Moreover, the *Vincent* Court found that restricting the posting of signs still left ample avenues for expression. *Id.* at 815-16. Signs could be carried, posted on cars, or posted on private property. *Id.* Therefore, seeing little difference between the facts in *Vincent* and the instant case, the court finds that pursuant to the Supreme Court's reasoning in *Vincent*, § 32-32 is sufficiently narrowly tailored to leave ample alternative avenues for expression.

**D.      § 32-26 Limitation on Playing of Musical Instruments**

In addition to the section prohibiting signs, Article II of the Parks Ordinance limits the volume at which a person may play musical instruments in the park.

> It shall be unlawful for any person to play any musical instrument within the parks other than for his own enjoyment, provided that such person shall not thereby encroach upon the use and enjoyment of the parks by others.

§ 32-26.  SEIU argues that the ordinance is content-based because it allows only some music. Additionally, SEIU contends that there is no compelling interest in prohibiting music played for others' enjoyment.  And last, SEIU urges that the ordinance is vague, leaving musicians and law enforcement alike to determine for whose enjoyment music is played.  The City did not respond to any of these arguments in its motion, so the court is left to extrapolate the City's interests.  The section is found in Article II which, as discussed above, addresses damage to the parks and the people in the parks.  Additionally, the ordinance cross-references the Sound ordinance.  Therefore, the City's legitimate interest in enacting this ordinance is to protect the enjoyment of other park patrons from intrusive noise.  *Ward*, 491 U.S. at 797.

The ordinance is content-neutral because it regulates all music played too loudly or for financial gain in the parks regardless of message.  The ordinance does not reference content, nor is its purpose, as extrapolated above, based on the message of the musician.  Therefore, the ordinance is deemed content neutral.  *Ward*, 491 U.S. at 791.

Because the ordinance is content neutral, the government interest need only be significant, not compelling.  *Perry*, 460 U.S. at 45.  That the City's interest in protecting its citizens from unwanted noise and "ensuring the ability of its citizens to enjoy [the] benefits the city parks have to offer" is a familiar mantra at this point.  *Id.* at 797; *Kovacs*, 336 U.S. at 82.

And, the court finds that the ordinance is sufficiently narrowly tailored.  For the tailoring inquiry, the court asks whether the prohibited activity "is basically incompatible with the normal activity of a particular place at a particular time."  *Grayned*, 408 U.S. at 116.  The first clause of the ordinance  makes it unlawful for people to play instruments in the park other than for their own enjoyment.  § 32-26.  The City's interest here is preventing people from busking or performing for money without permission as required by § 32-8.  Street performers are at times incompatible with the quiet enjoyment of public spaces.  *See Berger v. City of Seattle*, 512 F.3d 582 (9th Cir. 2008) (discussing street performers' turf battles and upholding ordinance requiring permits).  On the other hand, it also prevents musicians—even those without a profit motive—from drawing large crowds. "[P]rotecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."  *Heffron*, 452 U.S. at 650.  The second clause provides that musicians "shall not . . . encroach upon the use and enjoyment of others."  This clause is extremely narrowly tailored such that it does not affect any protected conduct other than the exact substantive interest the City is attempting to regulate—citizens' ability to enjoy the park.  *Ward*, 491 U.S. 791.  Additionally, the ordinance leaves open ample alternative avenues for expression.  Musicians may play for their own enjoyment.  They can also obtain permits from the City and play for the enjoyment of others and their own financial gain.  Moreover, they can play their instruments on private property at any time, provided they do not violate the Sound Ordinance.  Therefore, the court finds that § 32-26 is a reasonable content neutral time, place, and manner regulation.

SEIUU also argues that § 32-26 is vague because it leaves law enforcement to determine whether a musician plays for his own enjoyment.  There may be some protected expression that is swept into the ambit of this ordinance.  However, the vast majority of people playing instruments in the parks will be playing quietly for their enjoyment, or busking, gathering a crowd, and bothering

other park-goers.  Therefore, the ordinance is not substantially overbroad and the court will not

invalidate it.  *Hicks*, 539 U.S. at 199-20 (statute must be substantially overbroad both absolutely and

relatively before applying the strong medicine of overbreadth invalidation).

## III.    The Parade Ordinance

SEIU contends that the Parade Ordinance is not a proper content neutral regulation of time,

place, and manner.  In particular, SEIU points to (1) the restrictions on the number, timing, routes,

and length of parades (2) the 10 day notice requirement, and (3) the restrictions on traffic control.

Additionally, SEIU brings a facial challenge against the Parade Ordinance contending that the

ordinance's definition of "parade" is unconstitutionally vague and overbroad.  Finally, SEIU argues

that the Parade Ordinance is an impermissible prior restraint on speech because its definition of

parade extends to groups as small as two people.

### A.    Time, Place, and Manner Restrictions

The court must begin its analysis by determining if the Parade Ordinance is a content neutral

regulation that serves a significant government interest, is narrowly tailored, and leaves open ample

alternate avenues of communication.  *Clark*, 468 U.S. at 293.

#### 1.    Content Neutral or Content Based

A regulation is content based if it regulates protected activity based on the message the

expression conveys.  *Ward*, 491 U.S. at 791.  However, if the government justifies the regulation

without reference to the content of the speech "it is deemed neutral, even if it has an incidental effect

on some speakers or messages but not others.  *Id.*  SEIU first argues that the definition of parade is

content based because it exempts funeral processions.  In the intervening period between when this

court reviewed the Parade Ordinance in November 2006 and the present, City Council has amended

the definition of parade.  *See.* Dkts. 17, 56.  The new definition does not exempt funeral processions.

Parade means a procession of pedestrians, vehicles, or animals, or any combination thereof, traveling in unison along or upon a street, road, or highway, organized and conducted for the purposes of attracting the attention of the general public and/or expressing or celebrating views or ideas by use of verbal, visual, literary, or auditory means of communication. A parade shall not mean a procession of vehicles operated in compliance with ordinary traffic laws or a procession of pedestrians along or upon public sidewalks or private property.

§ 45-231.

Since the ordinance has been amended to delete the exemption, the issue should be moot. However, SEIU argues that because funeral processions have their own division within the Parade Ordinance that does not require permits, funeral processions are still exempted in practice. The City contends that funeral processions are regulated separately based on content neutral criteria. The court agrees that the differences are content neutral.

The Parade Ordinance may be found in Article IX of Chapter 45—entitled Traffic—of the City of Houston Ordinances. Division 1 of the Parade Ordinance deals with parades generally. Division 2 covers traffic laws with regard to funeral processions.[9] Because the City placed the

---

[9] The sections dealing with funeral processions discussed by the court, read as follows:

Sec. 45-252. Use of streets during certain hours. It shall be unlawful for a funeral procession to travel on the streets of the city, including freeways and expressways, between the hours of 7:00 a.m. and 9:00 a.m. and between the hours of 4:00 p.m. and 6:00 p.m., Monday through Friday, inclusive. Funeral processions may use the streets at any hour on a legal holiday.

Sec. 45-253. Police escort. Each funeral procession shall be accompanied by a police motorcycle escort which shall be a part of the funeral procession and the police officer's motorcycle shall constitute an emergency vehicle when the siren and red lights are in operation. There shall be not less than one police motorcycle escort when the vehicles in the funeral procession, including the mortuary vehicles, do not exceed ten and there shall be not less than two police motorcycle escorts when such vehicles exceed ten.

Sec. 45-254. Drivers to use right-hand edge of roadway and follow vehicle ahead as close as practical. Each driver in a funeral or other procession shall drive as near to the right-hand edge of

33

ordinances governing funeral processions within the Parade Ordinance, the City clearly considers a funeral procession to be a parade.   However, a review of the funeral procession ordinance highlights the differences between general parades and funeral processions.   The City first argues that funeral processions have a different purpose—their purpose is not to attract attention.   SEIU claims that this distinction is content based.   However, wanting to attract attention is not a function of the message the speaker imparts, but rather a predictor of the impact of the expression on the regular flow of traffic throughout the City.   Parades block off entire streets and intersections for stretches of up to 25 intersections.   *See* §§ 45-233(b)(1) & 45-234(b)(1).   Ordinary traffic laws are suspended for the area and duration of the parade.   They require extensive security, and the City may reasonably anticipate that crowds of observers will congregate on the sidewalks to watch the parade. §§ 45-232(d)-(f).   In practice, parades are generally advertised so that the general public can anticipate the date of the event and plan to attend.   By contrast, a funeral procession is required to use one lane of traffic only and that lane must be as far to the right as is practical.   § 45-254.   Each

---

the roadway as practical and shall follow the vehicle ahead as close as is practical and safe.

Sec. 45-255. Speed. The drivers of motor vehicles participating in a funeral procession shall obey the applicable speed limit; provided, however, if, in the opinion of the police escort, conditions require that the funeral procession proceed at a speed less than the minimum speed limit or if conditions require that the procession be brought to a complete stop, such direction shall be obeyed by the participants in the funeral procession.

Sec. 45-256. Obedience to traffic signals. It shall be unlawful for the driver of a vehicle being the leader of a funeral procession to enter into an intersection in violation of a traffic signal, stop sign or direction of a police officer; however, as soon as the procession has started through an intersection, the whole procession may continue through without stopping or observing the direction of such stop sign or traffic signal, provided such vehicles are conspicuously designated as required by this division.

City of Houston Code of Ordinances, Chapter 45, Art. IX, Div. 2.

car in the procession must follow the car in front of it as closely as practicable.  *Id.*  The first car in a funeral procession must follow the regular traffic laws, although the following cars may proceed behind the front car regardless of the traffic lights.  § 45-256.  At the most, the security for a funeral procession entails two police motorcycle escorts.  § 45-253.  Funeral processions serve a different purpose as well.  Their function is to transport the body of the deceased from the place were the funeral service was held to the place of internment.  Although there may certainly be parades that honor the passing of noteworthy people, the function and result of a parade versus a funeral procession is different based on content neutral criteria.  *Accord Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1138 (6th Cir. 1991).

SEIU counters that a parade may follow the same rules as a funeral procession and still require a permit, simply because it is a parade.  Therefore, SEIU concludes that the content of the expression must be the determining factor.  A parade is defined in the dictionary as "a pompous show" or "exhibition."  WEBSTER'S NEW COLLEGIATE DICTIONARY 830 (1977).  Implicit in both of these definitions is that a parade is an expression of some idea or ideas.  The distinction between a parade and a funeral procession is not the *content* of the expression, but the *existence* of expression.  A funeral parade is functional.  That the people who see a funeral procession going by know that those in the procession are grieving is incidental to the fact that the procession exists to go from the service to the grave.  Therefore, that there is some "incidental effect on some speakers or messages but not others" does not invalidate the ordinance's content neutrality.  *Burson*m 504 U.S. at 198.

SEIU also argues that the Fifth Circuit's decisions in *Beckerman* and *Knowles* preclude a finding that an exemption for a funeral procession is content neutral.  However, *Beckerman* and *Knowles* are distinguishable.  In *Beckerman* the court invalidated an ordinance that required marchers in the street to march unarmed, in the right lane of traffic, in rows with specific distance

between the marchers.  *Beckerman*, 664 F.2d at 513.  But, the ordinance exempted student marchers

or government marchers from these perfectly legitimate requirements.  *Id.*  The court held that if

"Tupelo were truly interested in traffic control, it would confine all marchers to one lane and groups

of 100 or fewer."  *Id.*  "Because the City is so willing to disregard the traffic problems in those

circumstances, we cannot accept the contention that traffic control is a substantial interest."  *Id.*

Unlike parades and funeral processions, student and government marchers created identical traffic

problems to other marchers.  The regulation was unconstitutionally underinclusive because its

exceptions undermined the government's purported interest.  *City of Ladue*, 512 U.S. at 53

("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy

for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish

the credibility of the government's rationale for restricting speech in the first place.").  In the instant

case, the exemption of funeral processions is based on rational content neutral criteria and does not

diminish the City's credibility.

In *Knowles*, the exemptions to the Parade Ordinance dwarfed its applications.  *Knowles v.*
*City of Waco*, 462 F.3d 430, 436-37 (5th Cir. 2006).  Waco's ordinance exempted

> funeral processions;
>
> "[s]tudents going to and from classes or participating in educational or recreational
> activities under the immediate direction and supervision of the proper school
> authorities";
>
> "a governmental agency acting within the scope of its functions";
>
> "[s]idewalk processions which observe and comply with traffic regulations and
> traffic-control devices, utilizing that portion of a sidewalk farthest from the street";
> and
>
> "[p]rocessions or demonstrations at a fixed location which is not a street or
> sidewalk."

*Id.* at 436. As here, Waco's interest was the safety of its citizens and the flow of traffic. *Id.* at 437. Citing *Beckerman* and based on the numerous exemptions, the *Knowles* court invalidated the entire parade ordinance. *Id.* In the instant case, the City only exempts funeral processions from the parade ordinance. And, the court finds that unlike the ordinances in *Beckerman* and *Knowles* the exemption at issue here is based entirely on a distinction between the types of traffic issues created rather than the identities of the speakers. Therefore, the court finds that the exemptions from the Parade Ordinance do not render it content based.

SEIU does not contend that any of the other provisions of the Parade Ordinance at issue are content based. Therefore, the court need not address them.

2. <u>Narrowly Tailored to Serve a Significant Government Interest</u>

Next SEIU challenges several portions of the Parade Ordinance on the basis that they are not narrowly tailored to serve a significant government interest.[10] The government's interest in regulating the safety and convenience of the public in a public forum is significant. *Heffron*, 452 U.S. at 650; *Grayned*, 408 U.S. at 115.

> The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need.

*Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S. Ct. 762 (1941).

a. Regulation of Groups as Small as Two People

SEIU argues and the City does not deny that the definition of "parade" in the Parade Ordinance encompasses groups as small as two people if they are walking in the street downtown.

---

[10] Having established that the Parade Ordinance is content neutral, the government interest need only be significant rather than compelling. *Perry*, 460 U.S. at 45.

*See* Dkt. 17 ¶ 20.  The City argues that "a parade in the streets regardless of the number of people involved, disrupts traffic and presents safety concerns which justify the requirement of a permit." Dkt. 53.  The Fifth Circuit in *Knowles* examined a parade ordinance under which the definition of parade could include as few as two people.

> Accordingly, the ordinance may be interpreted to require a prior permit for the activity of as few as two people.  Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest.

*Knowles*, 462 F.3d at 436 (citing *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir.1996) (ten persons); *Grossman v. City of Portland*, 33 F.3d 1200, 1202-06 (9th Cir.1994) (six persons); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C.Cir.1990) (ordinance requiring two or more people speaking or proselytizing together in any above-ground areas of the Metro to obtain a permit was not narrowly tailored because many such small-numbered groups "would not interfere meaningfully" with the government's asserted interests)).

Although the court in *Knowles* found that the definition of parade was not narrowly tailored, because among other things it encompassed groups as small as two people, the Parade Ordinance here is significantly more narrow.  In *Knowles*, the definition of a parade was "a procession of pedestrians, vehicles and animals or any combination thereof along or upon a street *or sidewalk, park or other public place*, which does not comply with normal and usual traffic regulations or controls." *Id.* at 432.  In the instant case, the definition applies only to a "procession of pedestrians, vehicles, or animals, or any combination thereof, traveling in unison along or upon a street . . . conducted for the purposes of attracting attention of the general public. . . . A parade shall not mean a . . . procession of pedestrians along or upon public sidewalks or private property." § 45-231.  Here, the definition is narrowed in two important respects.  First, it applies only to pedestrians walking

38

together in unison in the street.  In *Knowles* the definition applied to groups on the sidewalk, in parks or any public place.  If, as the City of Waco averred the City's interest was in regulating traffic, the definition certainly swept in more expression than necessary.  Second, in the instant case not only must the pedestrians be walking in the street, but they must be engaged in specific activity.  They must be actively, through the use of verbal communication, symbolic communication, or written communication, attempting to attract attention to themselves.  This distinction is important because the heart of the Parade Ordinance is to regulate the flow of traffic for the rest of the citizens.  People attempting to attract attention to themselves generally succeed at least in part.  The City judged, quite rightly, that this behavior on the part of the pedestrians would distract drivers.  Therefore, the City worded its definition to sweep in only that conduct that would create traffic problems and/or pose a danger to the pedestrians themselves.  Unlike the City of Waco's definition of parade invalidated by the *Knowles* court, the City of Houston's definition of parade is narrowly tailored.

> b.      Limits on Length, Duration and Route of Parades.

The City contends that the sections of the Parade Ordinance regulating the number of parades per day (§ 45-235(i)(1)-(2)), the hours during which a parade may be held (§§ 45-233(b)(2) & 45-234(b)(3)), and the routes—both location and length—available for parades (§§ 45-233(b) & 45-234(b)) all serve the significant interest of traffic control.[11]   And indeed, they clearly do.  As discussed above, parades can shut down streets and intersections for up to 3 hours and 25 intersections.  §§ 45-233 and 45-234.  The Parade Ordinance limits parade permits to four parades a day, one of which may be in downtown.  § 45-255(i).  Additionally, parades may not be conducted

---

[11]   Because of the length of the sections of the Parade Ordinance at issue, the court will not reproduce them here.  The recent version of the Parade Ordinance—minus the funeral procession provisions—may be found as an exhibit to docket entry 56 in this case.  Dkt. 56, Ex. A.

on streets that connect directly to the highway or on any highway or feeder street to a highway. §
45-234(b)(5). Main Street, which now has light rail tracks, train and stations situated at its center,
is not available for parades.[12] § 45-233(b)(5). The Parade Ordinance also limits the number of
blocks and intersections a parade may immobilize. §§ 45-233(b)(1) and 45-234(b)(1). And finally,
the ordinance does not allow parades during morning and evening rush hour and the noon hour. §§
45-233(b)(2) and 45-234(b)(2). All of these sections address the ability of citizens to travel the
streets of the City with relative ease. As the court can attest, traffic in the City of Houston on its best
days is challenging at the very least. That the City of Houston makes available for parades the time
and space delineated by the Parade Ordinance shows a dedication on the part of the City to allow
expression in the form of parades.

SEIU argues that these restrictions are not narrowly tailored. SEIU contends that the City
does not take into consideration the size of the parade when issuing its four permits a day. Small
parades are less disruptive to the City, according to SEIU. This argument fails because the limit on
the number of parades is a function of traffic patterns. A parade of 12 people who close 15
intersections in downtown for two hours creates similar traffic difficulties to a parade of 20,000 who
close 15 intersections in downtown for two hours. Additionally, SEIU argues that the regulation that
prohibits two parade from starting at the same time serves no purpose if the parades are in
completely different areas of town. However, the director may waive the time conflict rule if "[t]he
proposed parades will not substantially disrupt the use of any street in and around the parade
[routes'] respective locations." § 45-235(i)(3). SEIU argues that this does not cure the problem
because there are no objective standards for the director to apply in making this decision. The court

---

[12] The court notes that a parade on Main Street would affect not just Main Street but the
entire Metro Light Rail line that passes through Main Street.

disagrees. The standard is the consideration of the exact interest in which the City has a significant interest—traffic. The director bases his or her decision to waive on whether the conflict causes disruptions in traffic.

SEIU also argues that the City's limitation on parades to certain hours of the day is not narrowly tailored. Citing *Knowles*, SEIU argues that the Fifth Circuit has recognized the importance of reaching the target audience. *See Knowles*, 462 F.3d at 433 ("The optimum time to protest coincides with school hours, precisely when the School Zone ordinance's potential ban is in effect."). However, *Knowles* did not hold that the speaker has a right to the optimum time to speak. *Id.* A closer study of the *Knowles* opinion reveals the quote instead describes the conflict between the appellants and the City of Waco and introduces the discussion by the *Knowles* court. *Id.* Moreover, the Supreme Court has held that "[t]he principles of First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather [a group] around him at any public place and at any time a group for discussion or instruction." *Poulos v. New Hampshire*, 345 U.S. 395, 406, 73 S. Ct. 760 (1953). Additionally, in order to advance its interest in safety, the City may regulate the use of its streets to facilitate times of historically high traffic flow. The City has done exactly that and no more. It has prohibited parades at times when commuters and foot traffic are heavy—rush hours and noon. SEIU argues that these are the times they would have the largest audience. Additionally, SEIU urges that there are areas of town that never experience rush hour but are still covered by the time limits. However, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647. Regardless of the level of gridlock experienced by various parts of the city during rush hours, a sizeable portion of the city is in transit during those periods. Any blockage in the city during those times can—and does—quickly snowball.

41

SEIU also argues that parades are treated differently from funeral processions and construction which are not forbidden to operate during the noon hour.  The court will not revisit its discussion of the rational differences between funeral processions and parades other than to find that there are enough content neutral differences to justify differential treatment.  Construction also creates different issues from parades in terms of traffic.  Construction certainly is disruptive for traffic.  However, construction is of longer duration than parades, and the City makes provisions to route traffic around it.  Additionally, construction does not tend to draw large stationary crowds like a parade.  Therefore, construction implicates different concerns for the City.

SEIU argues that the restrictions that limit a parade to either inside or outside downtown, and to one half of downtown are not narrowly tailored.  Downtown Houston is encircled by feeder streets onto major highways on all but one side and the Metro Light Rail on the remaining portion.  Therefore, movement  between inside and outside of downtown must close areas that the City has a legitimate interest in keeping open for traffic flow.  Additionally. crossing from the east to west side of downtown—or vise versa—requires that Main Street and therefore Metro Light Rail be shut down.  SEIU claims that the City allows Metro Light Rail to be halted for funeral processions.[13] Funeral processions are directed by a motorcycle officer who may stop the entire procession for as long as he deems necessary for traffic safety.  The rail runs north and south and does not cross over the east and west cross streets with each cycle of lights.  Therefore, although a funeral procession may cross Main Street through several cycles of lights, it does not necessarily disrupt the rail service.

---

[13] SEIU also argues that Main Street is closed each year for the Houston Marathon.  The record contains no information regarding the Houston Marathon.  The court cannot determine which permitting scheme would apply to the Marathon.  Therefore, the court will not address this argument.

And even if a funeral procession did stop the rail, the duration of the stoppage would be short, unlike the cessation of the rail for the several hours it takes to hold a parade.

SEIU also argues that the limitation of the length of a parade is not narrowly tailored. SEIU contends that since parade organizers must pay for any security beyond 15 blocks, the limitation has no purpose. However, the City may limit the length of the parade based on historic traffic patterns in the City. Traffic is lighter on the weekend, so the City allows longer parades. Traffic is lighter outside of downtown, so the City allows parades outside of downtown to be somewhat longer than those in downtown during the week. The parade length is clearly relative to the amount of traffic based on the time and place of the parade. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 798-99 (quoting *Albertini*, 472 U.S. at 689). The City's restrictions on the number of parades per day (§ 45-235(i)(1)-(2)), the hours during which a parade may be held (§§ 45-233(b)(2) & 45-234(b)(3)), and the routes—both location and length—available for parades (§§ 45-233(b) & 45-234(b)) are narrowly tailored because the City's significant interests in traffic flow, and health and safety would be achieved less effectively without them.

c.      Traffic Control Services

The City of Houston provides security and traffic control services for up to 2 parades per day and 15 intersections per parade. § 45-232(d)-(h). The security is allocated on a first come first served basis. *Id.* SEIU contends that the restriction is not narrowly tailored because it does not take into account the size of the parade. SEIU argues that since some parades are smaller and need less security, the City should be able to stretch its security further in some instances. This argument fails because the City is under no obligation to fund any security whatsoever. "[A] legislature's decision

43

not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation with Representation*, 461 U.S. 540, 549, 103 S. Ct. 1997 (1983). *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88,  118 S. Ct. 2168 (1998) ("[T]he Government may allocate competitive funding according to criteria . . . . So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities."); *Rust v. Sullivan*, 500 U.S. 173, 193, 111 S. Ct. 1959 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."). Here, the ordinance clearly does not contemplate content because it is based on a first come first served system. Therefore, it confers the benefit of funding for security and traffic control in a consistent, content neutral manner. The traffic control services regulation is sufficiently narrowly tailored.

3. <u>Leaving Ample Alternate Avenues of Communication</u>

SEIU argues in a general way that the ordinances' limits of length, duration and route of parades and traffic control services do not leave ample alternative avenues of communication. The court disagrees. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647. The City offers up to four parade permits per day. The available routes allow parades inside of downtown or in any other area of the City. Although the City limits the length of parades to minimize traffic issues, it allows a parade to block between 10 and 25 intersections depending on location and time. Additionally, permits for parades are granted for downtown in mid-morning and mid-afternoon on weekdays. "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of

44

unrestrained abuses." *Cox*, 312 U.S. at 574.  The court finds that the City of Houston Parade Ordinance leaves ample alternative avenues for expression.  Accordingly, the City of Houston Parade Ordinance is a constitutional content neutral time, place, and manner regulation.

**B.      Overbreadth, Vagueness, and Prior Restraint**[14]

As a predicate matter, SEIU lacks standing to bring a facial challenge to the Parade Ordinance based on overbreadth unless it can demonstrate that the ordinance is substantially overbroad.  *Hicks*, 539 U.S. at 118.  SEIU submitted parade applications which were denied. Findings of Fact, Dkt. 17 ¶ 34.  Additionally, SEIU lacks standing to bring a facial challenge against the Parade Ordinance unless it can show that the ordinance is vague in all of its applications.  *Hill*, 789 F.2d at 1127.  However, SEIU does have standing to bring both a facial challenge under a prior restraint theory and an as-applied challenge based on overbreadth and vagueness.

1.      <u>10 Day Notice Requirement</u>

SEIU argues and the City does not contest that the 10 day notice requirement in § 45-235(b) of the Parade Ordinance places a burden on protected expression.  Under the rubric of prior restraint, a permitting scheme that forces an applicant to give the City advance notice of events that in some cases the applicant cannot even foresee is unconstitutional.  *See Shuttlesworth*, 394 U.S. at 162 ("[T]iming is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in

---

[14] The court notes that segregating different arguments under First Amendment theories can be difficult.  In its motion for summary judgment although SEIUU identified some other overbreadth and vagueness arguments, the supporting arguments were more appropriately categorized as going to the issue of narrow tailoring.  Therefore, the court analyzed those arguments under that section and will not repeat the arguments here.

advance would place a severe burden upon the exercise of his constitutionally protected rights.")
(Harlan, J., concurring); *see also Grossman*, 33 F.3d at 1206 ("Moreover, because of the delay
caused by complying with the permitting procedures, immediate speech can no longer respond to
immediate issues.") (internal quotation omitted).  Other circuits have found notice requirements as
short as 5 days to be unconstitutional.  *Douglas*, 88 F.3d at 1524.  The City offered no reply to
SEIU's argument.   Therefore, because the 10 day notice requirement in § 45-235(b) places an
unacceptable burden on speech before it occurs, the court finds that it is an impermissible prior
restraint on speech.  Additionally, SEIU argues that the phrase "[n]ot later than the tenth business
day after receipt of the application, the SEM shall: notify the applicant . . ." gives the director too
much discretion to decide whether to inform the applicant on the first day or the tenth day.  But, §
45-235(c) does not require that the application be submitted at least 10 days before the parade, it
merely gives the director up to 10 days to respond to the application.  When, the applicant had to
submit an application 10 days before the date of the parade, § 45-235(c)'s 10 day period made sense.
However, since the court has invalidated the 10 day advance notice provision, § 45-235(c) runs the
risk of allowing the director to notify the applicant of the director's decision *after* the date of the
parade.  Therefore, in an abundance of caution, the court also invalidates the 10 days section of § 45-
235(c).  The court finds that § 45-235(b) and the 10 days phrase in § 45-235(c) are severable from
the rest of § 45-235.  Accordingly, § 45-235(b) shall be invalidated in its entirety, and § 45-235(c)
shall remain the same except for the removal of the phrase "[n]ot later than the tenth business day
after receipt of the application."[15]

---

[15]  Section 45-235(c) shall now read:

(c)    The SEM shall review each application to ensure that the time, place, and
manner of the proposed parade complies with the provisions of this division.  The

2.      Definition of Parade

SEIU contends that the Parade Ordinance is overbroad and vague and must therefore be invalidated.  As discussed above, the definition of parade in § 45-231 reaches only those persons who impact the City's legitimate interests in public health and safety, and traffic flow.  All other groups fall outside the ambit of the definition of parade.  However, even if the court were to find that the definition inadvertently swept in some protected expression—such as two people in the street trying to flag down a tow truck to tow their stalled car—it would not find that the overbreadth was in any way substantial.  *Hicks*, 539 U.S. at 118.    Therefore, the Parade Ordinance is not unconstitutionally overbroad based on its definition of parade.  Additionally, SEIU argues that the definition is unconstitutionally vague because it does not provide law enforcement with sufficient guidance to determine which processions are attempting to attract attention.  This argument fails because even were the court to accept the reasoning, it still would not render the definition vague in all of its applications.  *Hill*, 789 F.2d at 1127.  Accordingly, the court finds that the Parade Ordinance is not unconstitutionally vague in all of its applications.

3.      Discretion with Regard to Parade Routes

Section 45-236(13) requires that every application contain a provision under which the applicant agrees to modify his proposed parade route if

> [t]he director and police chief determine that the time, route, or size of the proposed parade will substantially disrupt the use of any street that is ordinarily subject to significant traffic congestion.

SEIU contends that this gives the director  unbridled discretion to roam at will and determine with no guidance whether a parade route should be changed.  However, the plain language of the

---

SEM shall:
(1)  Notify the applicant . . .

47

ordinance clearly defines the criteria on which the determination should be made: time, route, size of the parade, and the historic congestion of the streets on the proposed plan.  Although prior restraints come before the court under a heavy presumption against their validity, the court finds that § 45-236(13) does not constitute an impermissible prior restraint.  It is content neutral and serves a significant government interest in regulating the flow of traffic.  *Forsyth*, 505 U.S. at 130.  It is narrowly tailored as evidenced by the criteria the director is allowed to take into account.  *Id.*  It leaves open ample alternative avenues for expression because it allows the parade route to be modified rather than denying the permit altogether.  *Id.*  And finally, it does not delegate overly broad licensing discretion to a government official.  *Id.*  Rather it provides "narrow, objective, and definite standards to guide the licensing authority."  *Shuttlesworth*, 394 U.S., at 150-151.  Therefore, the court finds that § 45-236(13) is constitutional.

CONCLUSION

Pending before the court are the parties' cross-motions for summary judgment.  Upon consideration of the motions and responses of the parties, the plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and the defendants' is GRANTED IN PART and DENIED IN PART.

It is ORDERED that the plaintiffs' motion for summary judgment with regard to  Parks Ordinance § 32-66 is GRANTED.  Section 32-66 is hereby invalidated as unconstitutional.  Additionally, the plaintiffs' motion for summary judgment with regard to Parade Ordinance § 45-235(b) is GRANTED.  Section 45-235(b) is hereby invalidated as unconstitutional.  Last, the plaintiffs' motion for summary judgment regarding § 45-235(c)'s provision that the director may take up to 10 days to notify an applicant if their permit is denied is GRANTED.  However, the court does not invalidate the entire provision.  Section 45-235 shall now read:

48

(c)   The SEM shall review each application to ensure that the time, place, and manner of the proposed parade complies with the provisions of this division. The SEM shall:
      (1)   Notify the applicant . . .

The defendants' motion for summary judgment on these issues is DENIED.

It is additionally ORDERED that there is a genuine issue of material fact regarding the plaintiffs' as-applied challenge to Sound Ordinance §§ 30-6, 30-7 and 30-8.  Accordingly, on this issue both the plaintiffs' and the defendants' motions for summary judgment are DENIED.

It is additionally ORDERED that as to all other issues, the defendants' motion for summary judgment is GRANTED and the plaintiffs' motion for summary judgment is DENIED.

Finally, because this order does not determine the entire case, the issue of damages will be reserved until the last issues of liability are resolved.

It is so ORDERED.

Signed at Houston, Texas on March 31, 2008.

_____
Gray H. Miller
United States District Judge

49